UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-cr-00060-TJK |
| RICHARD ZACHARY ACKERMAN | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Zachary Ackerman to 10 months of imprisonment (the low end of Guidelines range), three years of supervised release (three years on Count One and one year on Count Two, to be served concurrently), $2,000 in restitution, and a mandatory assessment of $125 ($100 on Count One and $25 on Count Two).

### I.   INTRODUCTION

Ackerman participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

He stole a U.S. Capitol Police Officer's helmet and wore the helmet throughout his time on the Capitol grounds, including when he threw a water bottle at officers engaged in intense fighting with rioters on the Lower West Terrace. He bragged about his participation in the riot and described the helmet as his "war trophy."

The government recommends that the Court sentence Ackerman to 10 months of incarceration for his conviction of violation 18 U.S.C. § 231 (civil disorder), and 18 U.S.C. § 641 (theft of government property). A 10-month sentence reflects the gravity of Ackerman's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 26, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Ackerman's Role in the January 6, 2021 Attack on the Capitol

On the morning of January 6, 2021, Ackerman and a group of friends drove from New Hampshire to Washington, D.C. While in the car, Ackerman texted, "I'm omw to Washington DC rn" and then, "I will be going to see the action in these riots/protests." To another friend Ackerman

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

texted, "[i]f I get shot down there, just remember that I thought highly of you."

Ackerman and his companions walked around the National Monument during at least a portion of then-President Trump's speech. Then, Ackerman made his way to the Northwest Plaza where Ackerman picked up a helmet—clearly labeled "U.S. Capitol Police" with large white capital letters—and put it on.



Image 1: Screenshot from Exhibit 1, at 6:16
showing Ackerman (circled in red) putting on a U.S. Capitol Police helmet

Ackerman went from the Northwest Plaza towards an entrance to the Capitol Building on the Lower West Terrace.

There, sometime before 4:28, he joined the mob outside of the tunnel. He positioned himself just south of the door where he saw the violence and felt the effects of the Oleoresin Capsicum ("OC") spray that police used to try and deter the rioters. In Ackerman's words, "I'm

about right at the entrance... I've been sprayed twice," and "I got maced really bad."



Image 2: Screenshot from Exhibit 2 at 12:49,
showing Ackerman (circled in red) outside of the entrance to the tunnel, wearing the
stolen USCP helmet and gesturing obscenely at the police defending the Capitol building

Ackerman stood in that area for over five minutes. During that time, while officers were facing

assault after assault, Ackerman threw an apparently empty water bottle at officers in the tunnel.



Image 3: Screenshot from Exhibit 3 at 1:35,
showing Ackerman (circled in red) outside of the entrance to the tunnel

The bottle bounced off the archway, hit an officer's right arm, and another officer swatted the bottle away.



Image 4: Screenshot from CCV footage inside
the Tunnel showing the water bottle Ackerman threw

Ackerman later moved to a window to the right of the Tunnel. He watched as another rioter

5

repeatedly struck an exterior window of the Capitol building with an ice axe.



Image 5: Screenshot from Exhibit 4 at 00:00, showing
Ackerman (circled in red) watching as a woman strikes a Capitol window with an ice axe

He continued to watch as the woman and a few other rioters used a large tube as a battering ram on the window.



Image 6: Screenshot from Exhibit 5 at 00:10, showing

Ackerman (circled in red) watching as a group of rioters try to break a Capitol window

6

Ackerman appeared to celebrate the rioters' efforts in smashing the window by hugging the woman in the pink hat.



Image 7: Screenshot from Exhibit 6, at 00:32 showing
Ackerman (circled in red) embracing another rioter

***Ackerman's statements after the riot***

Following the riot, Ackerman posted images of the stolen helmet on Telegram. They show the helmet defiled with an NSC-131 sticker on the back and a Bay State Hooligans sticker on the front.   NSC-131 is a reference to the Nationalist Socialist Club 131, a neo-Nazi group based in the New England region. PSR ¶ 29, fn. 4.   On January 6, Ackerman was a member of NSC-131.

The caption under one of the posts contained an image of a trophy, "#DC," and "#FuckThePolice."



Images 8 (left) and 9 (right): images posted on Telegram
showing the helmet Ackerman stole from the Capitol on January 6, 2021

Ackerman was proud of his participation in the riot. While traveling back to New Hampshire, he, "I got maced really bad,' and "I was right there, in the eye of it."   He bragged to numerous people about stealing the helmet. To one person, he texted: "I stole a SWAT TEAM officers helmet" and then, "[i]t's a war trophy." To another, he texted, "[h]ere's the helmet I stole." To yet another individual, he texted, "I was at DC today," "I was right in the doorway to the building," and "I stole an officer's helmet." To a fourth individual, Ackerman texted, "I stormed the capital & grabbed a helmet off of the SWAT team," and "I ripped a chair out of the office & circled it around…it ended up getting thrown at the police."   To a fifth individual, Ackerman sent a selfie

8

of himself wearing the helmet and making a rude gesture:



Image 10: Screenshot from Ackerman's cellphone

In another digital conversation, Ackerman responded to a message that "Antifa creeps dressed as trump supporters [were] committing despicable acts" and hoping that Ackerman would "not be considered a member of Antifa." Ackerman responded, "[t]here might have been a few…but they only came along for the ride. I was there, & the people who fought at my side were Americans."

Three days after the riot, in another apparent attempt to brag about what he did, Ackerman texted a friend a link to a Vice article titled *Neo-Nazis Boast About Participation In Capitol Hill*

*Invasion*,[2] which included images of the helmet Ackerman stole during the riot (images 8 and 9, above).

Ackerman kept his war trophy for over seventeen months. The FBI obtained a warrant to search Ackerman's home and, on June 9, 2022, found the helmet with the NSC-131 stickers still affixed to it, stuffed inside the chimney in the fireplace in Ackerman's bedroom.

## III.    THE CHARGES AND PLEA AGREEMENT

On April 11, 2024, Ackerman was charged by Information with violations of 18 U.S.C. § 231 (civil disorder), and 18 U.S.C. § 641 (theft of government property).   That same day, Ackerman plead guilty to those charges pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Ackerman now faces sentencing on violations of 18 U.S.C. § 231 (civil disorder), and 18 U.S.C. § 641 (theft of government property).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, on Count One, Ackerman faces up to five years of imprisonment, supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.   On Count Two, Ackerman faces up to one year of imprisonment, supervised release of not more than one year, a fine of up to $100,000, restitution, and a mandatory special assessment of $25.

---

[2]   https://www.vice.com/en/article/93wnja/neo-nazis-boast-about-participation-in-capitol-hill-invasion (last visited July 3, 2024).

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly identifies the base offense level and specific offense characteristics but includes one error—it applies a downward adjustment under guideline 4C1.1.

The Guidelines analysis follows:

Count One: 18 U.S.C. § 231

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Offense Involved Physical Contact | +3 |
|  | **Total** | **13** |

Count Two: 18 U.S.C. § 641

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
|  | **Total** | **6** |

Grouping

U.S.S.G. § 3D1.2 Conviction counts cannot be grouped; each becomes own unit.

U.S.S.G. § 3D1.4(a) & (b) - total 1.5 units (offense level for Count Two is within 8 levels of the offense level for Count One)

|  |  |  |
|---|---|---|
| U.S.S.G. § 3D1.4 | Greater of the Adjusted Offense Levels | 13 |
| U.S.S.G. § 3D1.4 | Increase based on 1.5 units | +1 |
|  | **Total** | **14** |

| | |
|---|---|
| **Combined Offense Level** | **14** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | -2 |
| Chapter Four adjustment (U.S.S.G. § 4C1.1) | -2 |
| **Total Adjusted Offense Level:** | **10** |

11

*See* Plea Agreement at ¶¶ 5(A).

The PSR's error is to include a two-level reduction under U.S.S.G. § 4C1.1. Section 4C1.1(a)(3) excludes defendants who used "violence or credible threats of violence in connection with the offense."   Here, Ackerman's conduct involved violence and a credible threat of violence. An individual uses violence when "he uses physical force with the intent or effect of injuring or abusing another."   *United States v. Secor*, 21-cr-157 (TNM), ECF No. 63, at 2-3 (noting that throwing body weight against a door and trapping officers against them did not constitute violence but did constitute a threat of violence). Throwing a bottle involves the use of physical force and, under the circumstances present here, Ackerman did so with the intent of abusing the officers.

Moreover, Ackerman used a credible threat of violence. An individual makes a credible threat of violence "when he believably expresses an intention to use physical force to inflict harm." *Secor*, 21-cr-157 (TCM), ECF No. 63, at 3-4 (cleaned up). Ackerman joined a mob that vastly outnumbered officers in the Tunnel. He threw an object at officers while they were involved in intense fighting with rioters and under constant assault from the crowd. And though we know, with hindsight, that the bottle was apparently empty, the officers in the Tunnel likely did not. An officer in this situation would reasonably conclude that the person who threw the bottle intended to harm the officer. This is "especially true considering the broader context of the riot at the Capitol that day—in the midst of an ongoing civil disorder, conduct is more readily liable to be seen as threatening violence." *Id.* at 4. Under the totality of the circumstances present on January 6, 2021, flinging an object at officers during a volatile situation, knowing that other rioters were attacking those officers, and requiring an officer to react, constitutes a credible threat of violence.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the Ackerman's criminal history as category I, which is not disputed. PSR ¶ 59. Accordingly, based on the government's calculation of Ackerman's total adjusted offense level, after acceptance of responsibility, at 12, Ackerman's Guidelines imprisonment range is 10-16 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Ackerman's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Ackerman was well aware of the violence against police officers on January 6. By stealing a helmet, Ackerman deprived an officer of necessary protective gear. And he contributed to the chaos and unrelenting assault on officers at the Lower West Terrace. Even after feeling the effects of OC spray and throwing a water bottle at officers defending the Capitol, Ackerman remained at the Capitol and watched as others tried to smash a Capitol window. The nature and circumstances of Ackerman's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 10 months of imprisonment.

### B.  Ackerman's History and Characteristics

When Ackerman joined the mob on the Capitol grounds, he was part of a white nationalist organization that espoused racist views, though he denied extremist affiliations during his interview with probation. Ackerman is a young man who has suffered significant trauma in his life, including the untimely deaths of his mother and brother. He also has a history of substance abuse and violated his conditions of pretrial release when he briefly relapsed. While his childhood trauma, medical issues, and substance abuse issues warrant consideration, they do not warrant a downward variance.

14

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Ackerman's criminal conduct on January 6 was the epitome of disrespect for the law, highlighted by the post accompanying the picture of the helmet posed on social media on the evening of January 6—"#FuckThePolice. A 10-month sentence is necessary to reflect the seriousness of the offenses and promote respect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

Since January 6, Ackerman has not taken any steps to denounce his actions that day. Rather, he appeared proud of his actions and bragged about his "war trophy," a trophy he kept until recovered by law enforcement officials. As such, a period of incarceration is needed for specific deterrence.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Ackerman is deserving of a longer sentence than Brian Healion, whom this Court sentenced to 100 days of incarceration. *United States v. Healion*, 23-cr-230 (TJK). Healion coordinated with his local Proud Boys chapter before January 6 and, while on the West Plaza, grabbed a bike rack and yanked it away from an officer, and unlawfully remained in the Capitol for approximately 20 minutes. He pled guilty to one count of violating 18 U.S.C. § 231. Like Healion, Ackerman traveled to DC with a group that anticipated violence and remained in Capitol grounds for hours amidst the riot. But unlike Healion, Ackerman's conduct occurred while officers were in the midst of an unrelenting violent assault from the mob at the tunnel. Ackerman celebrated as others took weapons—including an ice ax and an item used as a battering ram—to the Capitol building. And Ackerman stole a helmet and bragged about his conduct, including describing the stolen helmet as a "war trophy." Moreover, Healion's guideline range (0-6 months) was lower than the range that applies to Ackerman, in part because Ackerman threw an object at an officer and hit that officer, while Healion did not.

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Ackerman's conduct is more comparable to that of Nolan Cooke and Roger Baugh, both of whom were sentenced to 12 months and one day of incarceration. *United States v. Cooke*, 22-cr-52 (RCL); *United States v. Baugh*, 22-cr-313 (JEB). Cooke's conduct included pushing through barricades and using a flagpole to hit a door to the Capitol. Like Ackerman, Cooke did not enter the building. And, like Ackerman, Cooke made statements celebrating the riot. Cooke breached multiple police lines, however, where Ackerman threw an object at officers only once.

Baugh, like Ackerman, positioned himself near the entrance of the tunnel and saw the intense fighting there. Baugh entered the tunnel twice and assisted other rioters who were pushing against officers. He also lost the firearm he brought with him to the Capitol on January 6. Both Bough and Ackerman witnessed violence against officers and chose to impede officers in the tunnel.

Like Ackerman, the defendant in *United States v. Mostofsky*, 21-cr-138 (JEB), pleaded guilty to violations of 18 U.S.C. § 231 and 18 U.S.C. § 641 (Mostofsky also pled guilty to a violation of 18 U.S.C. § 1752(a)(1)). Mostofsky was among the first of the rioters to breach the Capitol building at 2:13 p.m. after forcibly obstructing officers who were attempting to adjust barriers in the West Terrace. Inside the Capitol, Mostofsky stole protective gear, a Capitol Police bullet-proof vest and a riot shield, depriving police officers of those items who might have used them for protection during the riot.  Both Mostofsky and Ackerman impeded officers, watched other rioters as they clashed with police, cheered on others participating in the riot, and stole important law enforcement protective gear.  Unlike Ackerman, Mostofsky did not throw a projectile at the police nor claim that the stolen items were "war trophies" or otherwise seek to

capitalize on his crimes. Then Judge (now Chief Judge) Boasberg sentenced Mostofsky to 8 months of incarceration.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ackerman must pay $2,000 in restitution, which reflects in part the role Ackerman played in the riot on January 6.[8]  Plea Agreement at ¶ 12. As the plea agreement

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Ackerman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VIII.   FINE

Ackerman's convictions for violations of 18 U.S.C. § 231 (civil disorder), and 18 U.S.C. § 641 (theft of government property) subject him to a statutory maximum fine of $250,000 on Count One, and $100,000 on Count Two. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Ackerman's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 10 months of imprisonment (the low end of the Guidelines range as calculated by the

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

government), three years of supervised release (three years on Count One and one year on Count

Two, to be served concurrently), $2,000 in restation, and a mandatory assessment of $125 ($100

on Count One and $25 on Count Two).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    <u>/s/ Anna Z. Krasinski</u>
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov