UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | 1:24-CR-00060-TJK |
| | ] | |
| RICHARD ZACHARY ACKERMAN | ] | |
| | ] | |

SENTENCING MEMORANDUM

The defendant, Richard "Zach" Ackerman, by and through counsel, Eric Wolpin, hereby files this sentencing memorandum respectfully asking that the Court sentence him to time served[1] and supervised release on one felony count of civil disorder and one misdemeanor count of theft of government property. A sentence of that kind and length is sufficient but not greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

In support thereof, the defendant submits the following:

**I.    Introduction**

Zach is a young New Hampshire man with a traumatic past and significant mental health diagnoses. On January 6, 2021, Zach, then nineteen, went to the Capitol, where he picked up and retained a discarded law enforcement helmet. Zach was a part of a crowd assembled near the entrance to the Capitol, and he threw an empty plastic water bottle at a group of officers. Zach accepted responsibility for his

---

[1] Zach was detained on this offense from June 18, 2023, to June 20, 2023.

1

actions on January 6, 2021, pleading guilty to one count of civil disorder and one count of theft of government property. Zach has no prior criminal conviction record; he is now a felon. As detailed below, Zach has worked to better himself and tame the traumas, mental health disorders, and addiction that have challenged him throughout his short life.

Per 18 U.S.C. § 3553(a), the Court must consider and balance a series of factors to achieve a just sentence. Among those factors, the Court must consider a defendant's "history and characteristics," the offense conduct, "the kind of sentences available," the sentencing range, and the need to meet the quadrumvirate of sentencing goals set forth in § 3553(a)(2). For the reasons detailed below, the nature and circumstances of the offense and Zach's history and characteristics—including his youth at the time of the offense, his mental health, social, and cognitive history, his development and lack of recidivism during the pretrial supervisory period, and his completion of rehabilitative programs—support the imposition of a time served sentence followed by supervision.

## II. 18 U.S.C. § 3553(a)(1): The personal "history and characteristics" of Zach Ackerman support a supervisory sentence.

*A. Zach's family life and early years were marred by addiction and instability.*

Zach is twenty-three years old. He was nineteen years old on January 6, 2021. Zach is from Salem, New Hampshire, a town just north of the Massachusetts border. He was raised by his father, mother, and, at times, his much older half-sister. When Zach was a toddler, his mother developed a dependence on prescription opioids

following a medical procedure. She subsequently used her position as a nurse to unlawfully obtain medications and was sentenced to serve several years at the New Hampshire State Prison for Women in Goffstown, New Hampshire. Zach recalls regularly travelling to the prison to see his mother when he was a small child.

In or around first grade, Zach's mother returned home from prison. Zach's mother and father attempted to reestablish their relationship, but it was marred by each's struggle with addiction. Zach describes his homelife as highly tumultuous, punctuated by unsettling experiences: police visiting the home after family disputes; his mother asking Zach, then six years old, to provide urine for her drug screen; Zach finding his mother collapsed on the bathroom floor suffering from a drug overdose. The instability continued until his parents separated when Zach was in middle school. Zach was then sent to his half-sister's home in a different state. Zach struggled to adapt to a new school and to deal with his separation from his parents.

Zach's mother continued to drift through periods of sobriety, rehab facilities, and incarceration. His father continued to struggle with alcohol. Zach remained with his half-sister until his mother died, and Zach was allowed to return to his father's home. By that time, Zach's father had achieved long-term sobriety and was able to provide a more stable home.

Although his mother struggled with addiction and its consequences, Zach appreciated his mother deeply. Her addiction was an impediment to their relationship, but not one that diminished or negated her love and care for him. Zach's attachment to his mother's memory is evident in his retention of crafts she made for

3

him while imprisoned and the pictures and objects (i.e. her stethoscope) arranged in Zach's bedroom "shrine" that keeps her memory close. Zach remained close with his father as well; they live together, and Zach's father has been supportive throughout Zach's pretrial supervision.

Zach was sixteen years old when his mother died.[2] Her death was precipitated by her continuing drug use. This loss, compounded with other social and developmental challenges described below, led Zach to feel a deep anger at the world. He was socially isolated and lacking a community of supportive peers. He wanted explanations for his mother's suffering and sought exterior forces to blame for his pain. He found connections and explanations online that provided the affirmation and belonging that he lacked in school and in his community. During this timeframe and mindset, Zach said provocative things at school, found a place among angry young men with extreme views, and travelled to Washington D.C.

> B.  Zach struggled to make sense of the world after his mother's death and the tragic passing of his half-brother.

In April 2021, four years after his mother's death, Zach's older half-brother, Matt, was struck and killed by a passing train. As described in the attached article, Matt was homeless and battling alcoholism at the time; despite these struggles, he was remembered by social service providers as a "very gentle and very nice person."

---

[2] Exhibit A, *available at* https://www.goundreydewhirstfuneral.com/obituary/Michelle-Ackerman.

4

Exhibit B.[3] Zach looked up to Matt, who was significantly older. This sudden loss of a second mentor-figure was a harsh emotional blow for Zach, particularly where he struggled to connect with peers.

Soon thereafter, Zach began experimenting with drugs. Zach had been prescribed amphetamines throughout his childhood to treat his attention-deficit/ hyperactivity disorder (ADHD). No longer connected with school, doctors, and counselors, Zach, instead, self-medicated with methamphetamine. Zach began overusing methamphetamine; the guardrails provided by doctors, prescriptions, and measured doses fell away. He pivoted to fentanyl when methamphetamine's effects persisted. At the same time, Zach began spending most of his days and nights among the unhoused in Manchester, New Hampshire, the closest large city to his home. Overall, his life was directionless, and he was one overdose away from becoming the third member of his family to suffer an early, addiction-related death.

> C. *Zach started on a sober path prior to his arrest in this case. He has continued to walk that path over the last year.*

By the time of his arrest last June, Zach had begun to self-correct and change his life. Zach reported to the pretrial services officer upon his arrest that he had not used substances for the prior two weeks. He reported that he had recently completed a drug detoxification program, had obtained a prescription for medication assisted treatment (MAT), and was participating in a residential drug treatment program in

---

[3] Exhibit B, Mike LaBella, *Mayor: Police seek to keep Haverhill homeless away from tracks after fatal train collision,* The Eagle Tribune, Apr. 21, 2021 *available at* https://www.yahoo.com/video/mayor-police-seek-keep-haverhill-111700100.html.

5

Nashua, New Hampshire. A drug screen at the time of his arrest showed the presence of his prescribed medication and no other substances.

Following his arrest, Zach returned to residential treatment and completed the month-long, intensive program. He transitioned from residential treatment to a sober living program that required, among other rules, drug testing and attendance at self-help meetings. Zach remained there for several additional months. Zach subsequently moved back into his childhood home with his father. Since moving home, Zach has helped care for his father, who had limited sight while awaiting eye surgery, and their home. He has continued with MAT, returned to his prescribed ADHD medications, engaged in counseling, and gotten a job. Zach relapsed once during a brief window of time when his MAT was unavailable. He informed probation of his use and has otherwise maintained continuous sobriety for the past year.

> D. *From an early age, Zach struggled with developmental delays, hyperactivity, and navigating social interactions.*

Zach was first evaluated for developmental delays by the Salem (NH) School District when he was four years old. As noted within his school records,[4] Zach's father stayed home to care for him. Exhibit C at 79. His father described Zach's speech as difficult to understand and his attention as hard to focus. *Id.* The school enrolled Zach in speech therapy. *Id.*

A year later, at five years old, Zach was referred for an additional evaluation to examine "delayed motor difficulties and sensory processing" issues. *Id.* at 83. The

---

[4] The Defense has submitted Zach's school records from his childhood under seal as they include significant personal identifying information and relate to Zach's experiences as a juvenile.

6

evaluator noted Zach's "impulsiveness and difficulties with focus." *Id.* The evaluator identified a series of other challenges. *Id.* at 84 ("He is bothered by touch, hearing, and smells, and becomes easily bothered by loud noises," "tends to avoid messy play," "Zachary also exhibits difficulties with muscle tone and motor planning."). Zach was thereafter provided paraprofessionals in school. Zach describes feeling singled out and ostracized by the constant presence of a one-on-one aide in the classroom.

At six years old, Zach visited a pediatric neurological clinic "where [his] parents raised concerns that [Zach] might be autistic." *Id.* at 68. His parents described a series of developmental delays, *see id.* ("He didn't speak coherently until age 4," "Developmental milestones were not reached on time,") and his teachers noted a series of challenges Zach faced in school. *Id.* at 70 ("walking into walls," "attempting to wander in the woods," becoming "very upset in the lunchroom because the noise level was 'too loud' for him," and having a "very narrow interest and [that he] tends to obsess over."). As described below, suspicions, concerns, and conclusions that Zach was autistic followed him through school. Later records describe him as having a "nonverbal learning disorder." *Id.* at 14.

At eight years old, a school evaluator looked further into concerns about Zach's poor "development of social interaction skills." *Id.* at 51. Test results at that time indicated that "Zach has the ability to recognize some facial expressions," but that he "had difficulty understanding another persons' thoughts and points of view both [] visually and in a social context." *Id.* at 58.

7

An evaluation at twelve years old demonstrated that Zach had insight into his struggle with academics, attention, and social interactions. The evaluator noted:

> In addition, Zach[] indicated via his responses that he is very concerned about his academic outcome and does not view himself as a successful student. This has created a significant amount of anxiety for him as he struggles to meet the demands of the 8th grade curriculum. Zach[] also indicated that he sees himself as having "problems staying focused and with attention". He stated, "I think I have a problem with attention because I am told I need to pay attention and I sometimes forget what I am doing in class." In addition, Zach[] often started several spontaneous conversations with this examiner by stating, "I don't mean to be offensive" . . . indicating he struggles with understanding how his words may impact others and is very unsure of himself when trying to conform with social awareness of differences. When asked why he stated this so much, he responded, "I don't know when I say things I shouldn't and I want people to know that I am not trying to be offensive." He also stated that he "finally" had some friends this year, but that he, "really needs help with social stuff."

*Id.* at 27.

At sixteen years old, Zach was evaluated after acting out at school. The evaluation occurred about a year after his mother died. The evaluation was intended to determine whether Zach was a risk to himself or others. Zach told the evaluator that he "had been having difficulties" that "affected his peer relationships and school performance." *Id.* at 16. Zach noted that he saw his problems as centered around "depression, family conflict, and poor grades." *Id.* The evaluator noted the presence of numerous criteria for Autistic Spectrum Disorder (ASD) including "the presence of persistent deficits in social communication and interaction, including deficits in social/emotional reciprocity and nonverbal communication," and "restricted and repetitive patterns of behavior, interests, or activities, including insistence on sameness, inflexible adherence to routines, and fixated interests that are abnormal

8

in intensity or focus." *Id.* at 20. The evaluator provisionally diagnosed Zach with ASD consistent with Zach's interpersonal difficulties at school. *See Id.* at 20 ("I believe it is appropriate to provisionally diagnose [Zach] with autistic spectrum disorder based on the available information."). Notably, as to safety concerns, the evaluator found that Zach "does not appear to have ever been involved in an actual act of interpersonal violence," had not possessed weapons, and presented as low risk for acts of aggression. *Id.* Zach continued to attend high school and graduated in 2019.

As this last evaluation was a half-decade old, Counsel retained an expert, Dr. Shannon Bader, Ph.D., ABPP, a Board-Certified Specialist in Forensic Psychology, to provide an updated psychological evaluation. Notably, Zach "brought two large cans of energy drinks and three smaller energy drinks with him and drank all of these during the course of the evaluation." *Id.* at 7. In total, Zach consumed more than 700mg of caffeine to improve his focus and attention. Dr. Bader concluded that Zach's "description of his scattered thoughts combined with his response to this high amount of caffeine all suggest that he continues to meet criteria for ADHD." *Id.*

Following up on Zach's history and past provisional ASD diagnosis, Dr. Bader evaluated whether Zach presently meets criteria for ASD. Notably, the "gold standard" for ASD diagnosis, the ADI-R test, could not be completed in its standard form due to the limited availability of reliable information from childhood caregivers. *Id.* at 8. Nonetheless, using available historical records, Dr. Bader conducted a "non-standardized administration of the test" with the caveat that *"the reader is cautioned that the results of this measure are considered less valid than a standardized*

9

*administration would be.*" *Id.* (emphasis in original). She concluded that Zach's "behaviors and interests are circumscribed and focused, consistent with ASD, but that his social interactions may not be impaired in the way described by the ASD diagnostic criteria." *Id.* at 6. Dr. Bader noted that Zach's "diagnosis is complicated by his experience of trauma and neglect." *Id.* at 8. She explained that:

> [c]hildren with disrupted childhood attachments, such as Zach, often show dampened expression of positive emotions, language delays, and impaired social interactions. It is difficult to distinguish if Zach's identified developmental delays were due to the neurodevelopmental process seen in ASD, his experience of neglect, or a combination of both. As Zach aged, he continued to experience significant traumatic experiences. Indeed, following his mother's death, Zach described anger, and reported, "I didn't take care of myself." The records highlight his difficulty with social interactions, however, Zach described attending school wearing urine-stained clothing and "trying to get attention for myself from saying negative things." It is again difficult to differentiate if Zach's struggle with peer relationships was due to the social reciprocity deficits of ASD or behavioral reactions to his trauma experiences. During this evaluation, Zack identified that he sees many of his daily struggles rooted in "attachment issues, getting over mental trauma" and provided an example of being "willing to do whatever to make a friend, I have attachment issues so I may bend over backwards to keep a friend." This statement highlights that Zack may understand and appreciate what a friend needs or wants, showing good social insight, but then may choose to provide those needs when he should not due to his distorted sense of how to maintain healthy relationships.

*Id.*[5] Dr. Bader concluded that Zach demonstrated certain relational deficits and difficulty with non-verbal communication but did not display sufficient requirements to permit an ASD diagnosis. *See Id.* ("Although Zach's presentation is complex, it is this writer's opinion that his early developmental delays and social difficulties are

---

[5] For the sake of consistency with the balance of the sentencing memorandum, Counsel has substituted "Zach" for "Mr. Ackerman" when presenting quotations from Dr. Bader.

10

rooted in his disrupted parental attachments, history of neglect, and multiple experiences of trauma."). Dr. Bader found, instead, that Zach meets criteria for Post-Traumatic Stress Disorder (PTSD) considering, among other things, his "intrusive, distressing memories of [his mother's] death," and ADHD. *Id.* at 9.

> E. *Zach has successfully managed his mental health and addiction while on pretrial supervision.*

Zach stopped using methamphetamine and returned to managing his ADHD with prescribed medications before his arrest. While on pretrial supervision, Zach connected with three local service agencies: he receives individual counseling once a week through the Center for Life Management (NH); a psychiatrist prescribes him mental health medications and regularly drug tests him at Spidaliere Psychological Associates (NH); and he is prescribed MAT and participates in group meetings with Better Life Partners (NH). Once Zach achieved steady housing, counseling, and sobriety, he sought a job. He now works full time at a chain coffee shop near his home. Employment allows him to assist his father financially and be less reliant on his family to meet his needs.

Although Zach is housed and sober, he retains his connections to the men and women he met on Manchester's streets. Many Mondays, Zach leaves work and hops on a bus to Manchester, New Hampshire's largest city, 30-minutes away. He brings unsold donuts from work and passes them out to people living on the street. He does so without judgement, compensation, or credit. Zach wants to do something positive. He wants to be a part of a community. Zach's personal family history of addiction and

11

hardship make him uniquely suited to help others in need. Zach has worked through the anger that drove him in his teen years. He has addressed his addiction, stabilized his mental health, and come to grips with his past. He has found something meaningful and positive that supports his sobriety, gives him purpose, and allows him to care for others.

### III. 18 U.S.C. § 3553(a)(1): The "nature and circumstances of the offense" support a supervisory sentence.

Zach traveled to Washington D.C. on January 5, 2021. Zach had no transportation of his own. He received a ride from a friend. He did not travel as a representative of a group. Zach anticipated that there might be protests and disturbances, but he did not bring weapons, mace, or other tools in anticipation of committing acts of violence.

The following day, Zach walked to the Capital among a sea of others. While there, he saw a Capitol Police helmet on the ground. He was not present when the officer relinquished the helmet, nor did he have a role in removing it from the officer. Zach picked up the helmet and put it on his head. He retained the helmet and brought it home to New Hampshire. Taking the helmet forms the basis of the charge of theft of government property. Zach pled guilty to this charge and accepts responsibility for his actions. The helmet was later recovered at his home in New Hampshire and is presently in the government's possession.

Zach moved closer to the Capitol building among a crowd. He yelled toward officers and flashed his middle finger. Zach stood outside a tunnel where officers had

created a protective line. While there, Zach threw a discarded empty plastic water bottle. He threw it toward the opening of the tunnel where the officers were stationed. The bottle bounced off a wall, landing on an unidentified officer's arm. The water bottle did not injure the officer. Zach made no other physical contact with the officers. He did not throw any other objects towards the officers. This conduct forms the basis of the charge of civil disorder. Zach pled guilty to this charge and accepts responsibility for his actions.

### IV. Zach's youth at the time of the offense conduct and the differing culpability of minors supports the imposition of a supervisory sentence.

The Supreme Court, in *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48, 68 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012), has recognized that adolescents are fundamentally different from adults and that a defendant's youth is relevant to culpability and punishment. In *Graham*, the Court cited three essential characteristics which distinguish youth from adults for culpability purposes:

> [a]s compared to adults, juveniles have a "lack of maturity and an underdeveloped sense of responsibility"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed."

*Graham*, 560 U.S. at 68 (citing *Roper*, 543 U.S. at 569-70). In *Graham*, the Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," including "parts of the brain involved in behavior control [that] continue to mature through late adolescence." 560 U.S. at 68. In *Miller*, the Court emphasized that those scientific

13

findings, including "transient rashness, proclivity for risk, and inability to assess consequences . . . lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'" 567 U.S. at 472 (quoting *Roper*, 543 U.S. at 570).

The Guidelines recognize that "[a]ge (including youth) may be relevant in determining whether a departure is warranted if considerations of age, individually, or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines." U.S.S.G. §5H1.1. *See* U.S.S.G. Amendment 739 (2010) (amending §5H1.1 from "age (including youth) is **not** ordinarily relevant . . ." to "age (including youth **may be** relevant . . .") (emphasis added); Sentencing Guidelines for United States Courts, 88 Fed. Reg. 89142, 89146 (Dec. 26, 2023) ("Research has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward seeking behavior, although a more precise age would have to be determined on an individualized basis.").

Zach is a young person whose impulsive conduct (picking up a helmet, throwing an empty plastic water bottle at law enforcement) was likely tied to a combination of youth and a complex constellation of social deficits and mental health conditions. Zach was a teenager at the time of these offenses. He went to D.C. without weapons or items intended to aid in a physical skirmish. Zach's most severe conduct is fairly described as "impulsive;" he threw trash – an empty, plastic, disposable water bottle – towards a group of officers. It was an act, and decision to act, made without

14

premeditation, planning, or forethought. It was an object that would not cause physical injury and was not intended to cause physical injury. As studies identified by the Sentencing Commission suggest, the developmental stage of his teenage brain likely contributed to Zach's impulsive decision-making in this case.

Of note, and as discussed elsewhere, Zach, now several years older, has handled his pretrial supervision with maturity and diligence. Through hard work, he has transitioned from homelessness and addiction to sobriety and employment. He has dissolved relationships with people holding corrosive beliefs. He has stopped consuming strong political rhetoric and focused, instead, on making his own life better. He is less angry about his own life circumstances and more focused on the future.

Zach has spent the past year, with few missteps, successfully living up to the terms of his pretrial release. Courts may question how to reconcile youth and concerns about recidivism – a court may conclude a youthful defendant requires incarceration *because* he will remain youthful and impulsive and thus pose a high likelihood of recidivating. The answer, at least here, is that there is no such concern. The Court has a year-long track record of Zach's serious engagement with his obligation to be law-abiding and follow strict limits on his freedoms. The immature decisions Zach made as a teenager in an unprecedented and unfamiliar circumstance are unlikely to reoccur. His behavior while on pretrial supervision demonstrates that he does not have a generalized disregard for the law and that incarceration is not necessary for community protection or specific deterrence.

V. **The defense does not object to the guideline calculation set forth in the presentence report. The advisory guideline range provides for a supervisory sentence with a period of home confinement.**

The Defense has reviewed the guideline calculations in the presentence report and has no objection to the calculations contained therein. Per the PSR, the total offense level is ten. Zach has no prior criminal convictions and falls within criminal history category I. The resulting advisory guideline range is six to twelve months. Because this guideline range is within Zone B, the minimum term of imprisonment may be satisfied by a probationary sentence with home confinement for the length of the minimum term. U.S.S.G. §5B1.1(a)(2); U.S.S.G. §5C1.1(c)(3). Thus, the Court may impose supervision and remain within the guideline sentencing range.

The Court's obligation at sentencing post-*Booker*, however, is not to rotely follow the guidelines, but to follow the statutory dictates of 18 U.S.C. § 3553. For the reasons discussed in this memorandum, a sentence of time served and supervision is "sufficient, but not greater than necessary to comply with the" statutory purposes of sentencing. 18 U.S.C. § 3553(a).

VI. **Zach's mental health history would make for a challenging and counterproductive stay in federal prison. Other defendants with like backgrounds have received significant downward variances.**

As the Court is aware, hundreds of defendants have been sentenced for conduct committed on January 6, 2021. Even though these charges stem from the same event, sentencing comparators are often of limited value; sentencing is individualized, and no two defendants share the same "history and characteristics" or "nature and circumstances of the offense." 18 U.S.C. § 3553(a). *See Gall v. United States,* 552 U.S.

38, 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (citation omitted).

However, here, the Defense directs the Court to *United States v. Issacs*, 21-CR-28-APM, a January-Sixth case with similar mitigating factors and animating concerns. The Defense does not point to *Isaacs* to argue that "Zach deserves the same sentence," but does so because the court in *Isaacs* thoroughly weighed the role of youth and significant mental health diagnoses in the sentencing of a similarly situated defendant.

In *United States v. Isaacs*, Judge Mehta took account of mitigation facts comparable to those presented in this case. *See Sentencing Memorandum, United States v. Isaacs*, ECF Doc. 1026 at 3-7, Aug. 21, 2023, 21-CR-28-APM-16 (describing youthful defendant—21 years old on January 6, 2021—with comparable early signs of ASD and social isolation in school, a diagnosis of ADHD[6], who found his parent unconscious in bathroom after a drug overdose, and who suffered a series of significant family traumas). Mr. Isaacs was convicted of seven counts, including various felonies, after trial. *Judgment*, ECF Doc. 1054 at 1-2. He had a guideline range of 78 to 87 months. *Sentencing Transcript*, ECF Doc. 1176 at 39. The Court, in

---

[6] This is not noted in the sentencing memorandum but is discussed at sentencing. *Sentencing Transcript*, ECF Doc. 1176 at 57 (defense counsel noting that "Mr. Isaacs, with his condition that he's has since he was young, born, *plus the ADHD*, when he gets to prison – I don't care where he is sent, I don't care where – in prison, based on my experience at that table and this table, he's different.") (emphasis added).

17

discussing its sentencing considerations with the parties, noted grave concerns about how Mr. Isaacs would fare in prison:

> Look, I think it's clear what my concern is from what I sent you all yesterday, which is that what is the impact on a 23-year-old young man who has ASD. Yes, he can function, but he can function in a world -- he's capable of functioning but even then, it presents challenges. You put him in a carceral setting with staff who may not appreciate the deficits, with other inmates who may not appreciate the deficits and understand then, and what sort of risks – what kind of risk that puts him at, both physically and emotionally. And, you know, that is, I will tell you, a real concern of mine.
>
> . . .
>
> But the ASD and his youth are really substantial countervailing considerations, and I don't think anybody here, and I'm not suggesting the government is saying this, but we are not to incarcerate just for the sake of incarceration. And every defendant needs to be treated differently, looked at differently. And, you know, some of the other objectives of sentencing having very much been accomplished by the very many other sentences that have been imposed for the type of conduct that happened on January 6th. You know, I just don't want to have happen is for this young man to go in and come out far worse off, and I just fear that there is a real possibility of that happening.

*Id.* at 47, 51. The court in *Isaacs* conducted a thorough discussion of the defendant's serious offense conduct and personal history and cited other January Sixth cases where mental health issues, including ASD concerns, played a role in the imposition of significant downward variances. *See Id.* at 73 ("In *U.S. v. Rodean*, 21-cr-57 . . . Judge McFadden varied [from a guideline range of ten to sixteen months] and entered a sentence of 60 months of probation, in large part because of ASD being a factor in the defendant's conduct."). The Court noted that it did not "view Mr. Isaacs as a threat to reoffend . . . [o]r someone likely to pose a threat to the community," *id.* at 54, and

varied from the seventy-eight-month low end to impose a probationary sentence. *Id.* at 74.

Zach is similarly situated to Mr. Isaacs as far as personal history and characteristics. The nature and circumstances of Zach's offense are less severe, a difference reflected in a guideline range that is a fraction (6-12 months versus 78-87 months) of the range applicable to Mr. Issacs. Although Zach is not currently diagnosed with ASD, he bears many of its hallmarks. Since his preschool years, parents, teachers, and mental health professional have identified him as ASD or presumptively ASD based on his development and behaviors. Placing him in federal prison would present challenges, particularly with negotiating the myriad of social interactions and incessant noise of a prison. Zach has reset his life course—shifting from being unhoused, addicted, unemployed, angry, and unmedicated to housed, sober, working, and under a psychiatrist's case. A prison sentence would knock him off that perch without guarantee that he would leave prison in the same productive condition. To sentence him to supervision is to facilitate Zach's maintenance of his present trajectory. In the court's effort to "protect the public from future crimes of the defendant," and "provide [Zach] with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," supervision, not incarceration, best serve those ends. 18 U.S.C. §§3553(a)(2)(C), (D).

## VII. Conclusion

Since his arrest, Zach has parted ways with those who shared and stoked his anger. He has engaged fully with mental health and substance use disorder

19

counseling and medication to regain emotional and personal stability. Zach has aged and matured. He has begun addressing a series of past traumas. Zach accepted responsibility for his conduct on January 6, 2021. He has been successful and productive on pretrial supervision. He is young. Imprisonment would leave an indelible mark on Zach's development that would make him more, and not less, likely to recidivate. For all the reasons presented herein, a time served sentence with supervision best meets the statutorily defined ends of sentencing.

Respectfully submitted,

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar #18372
Assistant Federal Public Defender
Eric_Wolpin @fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2024, the above document was served electronically upon all counsel of record through the CM/ECF filing system.

*/s/ Eric Wolpin*
Eric Wolpin